# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

JOHNNIE WAYNE REEVES, )
)
Plaintiff, )              NO. 3:07-0177
)              JUDGE HAYNES
)
)
WAYNE BRANDON, Warden, )
)
Defendant: )

## MEMORANDUM

Petitioner, Johnnie Wayne Reeves, filed this pro se petition for the writ of habeas corpus

under 28 U.S.C. § 2254 seeking to set aside his convictions on two counts of aggravated child

abuse for which he received a sentence of 20 years. After a review of the petition, the Court

appointed the Federal Public Defender to represent Petitioner and denied Respondent's motion to

dismiss without prejudice to renew upon the filing of the amended petition. Petitioner filed an

amended petition on October 4, 2007 and the parties completed discovery.

Before the Court is the Respondent's renewed motion to dismiss and for judgment as a

matter of law on the amended petition claims. (Docket Entry No. 54). Petitioner filed a response,

(Docket Entry No. 62) with affidavits. The Court conducted an evidentiary hearing. (Docket

Entry Nos. 64, 65 and 72).

### A. Procedural History

After a jury trial, Petitioner was convicted of two counts of aggravated child abuse of a

child of six years of age. On his direct appeal, Petitioner challenged the sufficiency of the

evidence and the trial court's admission of pictures of the victim's injuries. State v. Reeves,

2003 WL 22004946 (Tenn. Ct. Crim. App. Aug. 26, 2003). The Tennessee Court of Criminal

Appeals affirmed and the Tennessee Supreme Court denied Petitioner's application for permission to appeal. Id.

Petitioner filed his post-conviction petition and the trial court appointed counsel and held an evidentiary hearing. The trial court denied the petition and on appeal, the Tennessee Court of Criminal Appeals affirmed. Reeves v. State, 2006 WL 360380 (Tenn. Crim. App. Feb. 16, 2006). The Tennessee Supreme Court denied Petitioner's application for review. Id.

On February 9, 2007, Petitioner filed this action. Petitioner filed his amended petition on October 3, 2009. (Docket Entry No. 26).

## B. Review of the State Record

### 1. Findings of Fact[1]

On direct appeal, the Tennessee Court of Criminal Appeal found the following facts underlying Petitioner's convictions:

> The defendant was convicted of two counts of aggravated child abuse of a child six years of age or less for choking the victim, W.R., with a dog leash and hitting him on his buttocks with a wooden board, both incidents occurring on June 16, 2000. The victim testified he was six years old at the time of trial and four or five years old when the events occurred. He stated that when the incidents occurred, he was living with his grandmother, his mother, and "Johnnie."
>
> > In accordance with this court's policy, we refer to victims of child abuse by their initials.
>
> The victim testified that on one occasion while he and "Johnnie" were alone inside the residence, "Johnnie" placed a dog leash around his neck and instructed him to stick his fingers down his throat. "Johnnie" then yanked the dog leash around the victim's neck "four or five ... maybe ten" times. The victim stated "[i]t hurt and felt like some blood was getting [sic] to ... bust out." He then fell on the

---

[1] State appellate court opinion findings can constitute factual findings in a habeas action . Sumner v. Mata, 449 U.S. 539, 546-47 (1981) and have a statutory presumption of correctness 28 U.S.C. § 2254(d).

2

floor. The victim testified his neck was bruised as a result, and he denied causing the injuries himself.

The victim testified that on the same day, "Johnnie" spanked him on his buttocks with a black shelf from the entertainment center. He stated "Johnnie" spanked him with the board "[a] lot of times," and each time "Johnnie" spanked him, he fell on the floor. The victim further stated the spankings "hurt" and caused bruises on his buttocks. He testified "Johnnie" was the only person who ever spanked him with the board. Although the victim was unable to identify the defendant as "Johnnie" at trial, he stated only one person named "Johnnie" ever lived with his family.

Lydia Roberts, the victim's grandmother, testified that during the summer of 2000, the defendant and Pamela Roberts, her daughter and the victim's mother, dated, and the defendant lived with them for several weeks. She stated that on Thursday, June 15, 2000, she did not observe any bruises on the victim. On the morning of June 16th, the mother drove her to work while the victim was still sleeping. After the mother drove the grandmother back to her residence that afternoon, the mother, the defendant, and the victim went to a movie, and the grandmother only observed the victim from a distance while he was sitting inside the vehicle. The grandmother was sleeping when they returned to the residence later that night.

The grandmother testified that on Saturday morning, June 17th, while the victim was eating breakfast, she observed bruises in the shape of a hand print on the left side of the victim's face. She further observed that the inside of the victim's ear was purple, and there were scratches and bruises on his neck. When the grandmother attempted to question the victim regarding the injuries, he refused to talk about them. The grandmother testified the mother attempted to "explain away" the injuries by telling her that while the victim was outside, he became tangled in the dog's leash and fell. The grandmother stated that had the victim fallen after being caught in the leash, his knees and hands would have been scratched from the gravel in the driveway. She then called the Department of Children's Services (DCS) regarding the bruises on the victim's neck and her suspicions that the defendant caused the injuries, but DCS did not respond.

The grandmother testified that on Tuesday, June 20th, while helping the victim in the bathroom, she discovered bruises on his buttocks. She stated that "his whole bottom was bruised, up his back a little bit, and down a little lower on his legs." The victim then told her that the defendant had spanked him with a black shelf taken from the entertainment center. The grandmother stated the victim also informed her that his neck injuries were caused by a dog leash, which the defendant had placed around his neck. The grandmother stated she had two similar "thick, nylon-type" leashes, which she used when walking her dog. She testified that after the victim informed her about the causes of his injuries, she

3

again called DCS, and a case worker responded. She further stated that the victim never indicated that his mother caused the injuries; rather, he identified the defendant as the sole perpetrator.

The grandmother testified the victim had not seen the defendant since June 2000. She stated that in June 2000, the defendant wore earrings, had a shaved head, and dressed differently. His appearance had changed at the time of trial.

Detective Jana Buse Fadigan, who investigated the allegations, testified she spoke to the defendant over the telephone on June 26, 2000. The defendant informed her that he believed the victim's mother caused the injuries. He stated that while he was in the shower, the victim became tangled in a leash while playing outside and sustained injuries to his face and neck. The defendant testified that when the mother returned home and discovered what the victim had done, she spanked him twice on the buttocks with her hand and sent him to his room.

Detective Fadigan testified she later interviewed the defendant at the police station on July 10th. During this interview, the defendant stated he was left alone with the victim for approximately two hours while the mother ran errands. While he was taking a shower, he heard a "gagging" noise. The victim then ran into the bathroom and attempted to vomit into the toilet. The defendant then retrieved a wet rag for the victim and set him on the couch where he watched television until the mother returned. The defendant informed the mother what the victim had done and returned to the shower. The defendant stated that while he was in the shower, he heard the mother spank the victim twice with her hands and with a black board from the entertainment center. The defendant denied spanking the victim.

Detective Fadigan testified she interviewed the victim outside of the presence of his mother and his grandmother. The victim informed her that "Johnnie" had caused the injuries.

Dr. Christopher Greeley, a pediatrician, testified he reviewed photographs of the victim's injuries. He described the bruises on the victim's buttocks as "extensive" and "quite deep." Dr. Greeley opined these injuries were unlikely self-inflicted or accidental. He stated the bruises on the victim's buttocks were consistent with being struck repeatedly by a board. He further stated the victim likely experienced discomfort in sitting or walking until the injuries healed.

Dr. Greeley testified the victim's bruises, which spanned around his neck, were consistent with a leash being pulled around his neck. He opined that these injuries were unlikely self-inflicted or the result of an accident. Dr. Greeley stated the force of pulling an object around a person's neck could cause the person's carotid artery and windpipe to collapse, which could result in either brain damage or

4

death. Dr. Greeley further opined that the bruising to the victim's ear was consistent with being hit on the side of the head, and such bruising was rarely accidental.

Deborah Pigman, the DCS case worker who investigated the allegations, testified she initially interviewed the victim outside the presence of his mother and grandmother. During the interview, the victim informed her that while he and the defendant were alone at the residence, the defendant spanked him for sticking his fingers down his throat, kicked him, and choked him with the dog's leash. Pigman stated that in subsequent interviews, the victim never indicated anyone other than the defendant caused the injuries.

Pigman testified she was present during the detective's interview with the defendant. She stated the detective informed the defendant that he was the primary suspect regarding the allegations and made him aware of the time frame in which the injuries occurred. Pigman testified the defendant never told them that he was out of town when the incidents occurred.

Pamela Roberts, the victim's mother, testified that on Friday, June 16th, she left the victim alone with the defendant for approximately two and one-half hours while she ran errands. When she returned to the residence between 1:00 and 2:00 p.m., she observed bruises on the victim's face and neck. The mother stated that when she questioned the victim in the defendant's presence, the victim stated he had gotten tangled in the dog's leash. The defendant gave the mother the same explanation regarding the cause of the victim's injuries. The mother stated she, the victim, and the defendant went to the movies shortly after she drove the grandmother home from work and returned to the residence while the grandmother was sleeping.

The mother testified she did not observe the bruises on the victim's buttocks until Sunday, June 18th, after the grandmother had observed them. She stated that after the victim spoke to the police, he told her that the defendant had caused the injuries to his neck, face, and buttocks.

The mother testified that on the morning of June 16th, she spanked the victim three to four times on his buttocks with her hand. She stated the victim whined but did not cry. She further stated she did not spank the victim hard enough to cause the bruises. The mother denied ever spanking the victim with the black shelf.

The mother testified that when she confronted the defendant with the allegations, he admitted he caused the injuries. However, he stated she should admit to causing the injuries because she would receive a lesser sentence.

5

The mother stated that in June 2000, the defendant wore earrings, shaved his head, and appeared different than he did at trial. She further stated the defendant was the only person the victim referred to as "Johnnie."

The defendant testified he dated the victim's mother for a few months and spent the night at her residence on several occasions. He stated he and the mother broke up on Easter in 2000. The defendant stated that although he often played with the victim, he did not spank or otherwise discipline him. He further stated he observed the mother spank the victim on several occasions using her hands, a belt, and a black board from the entertainment center.

The defendant testified that on Easter Sunday, April 23, 2000, he observed an injury to the victim's neck, which was similar to the bruises depicted in the photographs. He stated the incidents to which he referred during the interview with the detective occurred a few weeks prior to Easter. The defendant maintained that when the detective interviewed him, she never informed him that she was referring to the events which occurred on June 16, 2000.

The defendant testified that on Tuesday, June 13th, he traveled to Bowling Green, Kentucky, to visit his father, who was remodeling a Wal-Mart store. On Friday, June 16th, the defendant, his father, Tyson Hall, and two other employees ate lunch together. After running errands, the defendant left Bowling Green at approximately 4:00 p.m. and arrived at his residence between 6:00 and 6:30 p.m. The defendant testified that on Sunday, June 18th, his cousins were killed in a car accident.

Wayne Raymond Reeves, the defendant's father, testified that from May until July 2000, he was in Bowling Green, Kentucky, remodeling a Wal Mart store. He stated the defendant visited him during the week prior to June 18th. On Friday, June 16th, Reeves, the defendant, and Tyson Hall, Reeves' supervisor, ate lunch together, and the defendant remained with Reeves until 3:00 or 4:00 p.m. Reeves stated he saw the defendant later that night at the Reeves residence in Tennessee. On June 18th, they discovered that two family members had been killed in a car accident.

Tyson Hall testified that while working at Bowling Green, he met the defendant and ate lunch with him and Reeves on a Friday. Although Hall could not recall the specific date, he stated that two days later on Sunday, Reeves informed him that he had a death in the family.

The jury convicted the defendant of two counts of aggravated child abuse of a child six years of age or less, Class A felonies. See Tenn. Code Ann. § 39-15-402(b). The trial court sentenced him as a violent offender to twenty years

6

on each count to be served concurrently.

2003 WL 22004946 at **1-4. Other State appellate court findings are presented in the analysis of Petitioner's specific claims.

## C. Federal Habeas Hearing

The Court set an evidentiary hearing on Petitioner's claim of actual innocence, Brady v. Maryland, 373 U.S. 83 (1963) violations, and Respondent's statute of limitations defense. The parties did not present any proof on the Brady and statute of limitations issues.

At the hearing, Petitioner presented only two witnesses who had earlier filed their affidavits on Petitioner's alibi defense. Donnie Gray, who in 2003 worked with the Petitioner on the removal of fixtures from a Wal-Mart store in Owensboro, Kentucky. Gray hired a crew that included Petitioner to load the fixtures onto the trucks. At the hearing, Gray initially testified that this removal occurred on June 18 through 20, 2000, but corrected himself to reflect that the removal occurred on a weekend; Friday, Saturday and Sunday starting on Friday, June 16, 2000. Gray later testified that Petitioner was present on Friday, June 16th, but on cross-examination admitted that in his affidavit he testified that Petitioner left in the early afternoon on Friday. Gray estimated that it would take about one hour and fifteen minutes to drive to Nashville.

Jerry Rickard who worked with Gray on the 2000 Wal-Mart removal project identified Petitioner as among the workers on this project. Petitioner operated the fork truck for the subsequent loading onto the trucks. This occurred during a time period of June 15, 16 and 17. Yet, Rickard had limited contact with Petitioner and observed Petitioner deliver several loads to the trucks.

7

## D. Conclusions of Law

Petitioner's habeas petition is governed by the provisions of the Antiterrorism and

Effective Death Penalty Act of 1996 ("AEDPA"). Lindh v. Murphy, 521 U.S. 320, 336 (1997).

Under the AEDPA, federal courts may not grant habeas relief for claims adjudicated on their

merits in a state court proceeding, unless that state court proceeding:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

In Williams v. Taylor, 529 U.S. 362, 413 (2000), the Supreme Court stated that a state

court judgment is "contrary to" clearly established federal law "if the state court arrives at a

conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state

court decides a case differently than [the Supreme] Court on a set of materially indistinguishable

facts." The Supreme Court interpreted the language "clearly established Federal law, as

determined by the Supreme Court of the United States"as referring to "holdings, as opposed to

dicta" of its decisions "as of the time of the relevant state-court decision." Id. at 412. In Bell v.

Cone, 535 U.S 685, 693 (2002), the Court reiterated that AEDPA modified a federal court's role

in reviewing state prisoner applications "in order to prevent federal habeas 'retrials' and to ensure

that state court convictions are given effect to the extent possible under the law."

Under the "unreasonable application" clause, a state court judgment results in an

"unreasonable application" of clearly established federal law "if the state court identifies the

8

correct governing legal rule from [the Supreme] Court's decision but unreasonably applies that principle to the facts of the prisoner's case." Id. The Supreme Court explained that a state court's application of clearly established federal law must be "objectively unreasonable," and a federal habeas court may not grant habeas relief "simply because that court concludes in its independent judgment that the relevant decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A state court's application of federal law is unreasonable and habeas relief may be granted if the "state court decision is so clearly incorrect that it would not be debatable among reasonable jurists." Herbert v. Billy, 160 F.3d 1131, 1135 (6th Cir. 1998) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir. 1996)).

In reaching this decision, the Supreme Court reiterated that the claims were to be decided on the record before the state court:

> In this and related contexts we have made clear that whether a state court's decision was unreasonable must be assessed in light of the record the court had before it. See Yarborough v. Gentry, 540 U.S. 1, 6, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003) (per curiam) 124 S.Ct., at 4 (denying relief where state court's application of federal law was "supported by the record"); Miller-El v. Cockrell, 537 U.S. 322, 348, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) (reasonableness of state court's factual finding assessed "in light of the record before the court"); cf. Bell v. Cone, 535 U.S. 685, 697, n. 4, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law).

Holland v. Jackson, 542 U.S. 649, 652 (2004) (emphasis added). The district court also "must presume that all determinations of factual issues made by the state court are correct unless the Defendant can rebut that presumption by clear and convincing evidence." Mitchell v. Mason, 325 F.3d 732, 738 (6th Cir. 2003) (citing 28 U.S.C. § 2254(e)(1)). This presumption includes

Case 3:07-cv-00177   Document 78   Filed 02/18/10   Page 9 of 30 PageID #: 312

credibility findings of the state courts. <u>Skaggs v. Parker</u>, 235 F.3d 261, 266 (6th Cir. 2001).

## 1. Exhausted Claims

### a. Sufficiency of the Evidence

The Tennessee Court of Criminal Appeals addressed Petitioner's various challenges to the sufficiency of the State's proof.

As applicable to the case at bar, a person commits aggravated child abuse, who "knowingly, other than by accidental means, treats a child ... in such a manner as to inflict injury," and the act is accomplished through the use of a "deadly weapon." Tenn. Code Ann. §§ 39-15-401(a), -402(a). If the abused child is six years old or less, the offense is a Class A felony. <u>Id.</u> § 39-15-402(b). A "deadly weapon" is "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." <u>Id.</u> § 39-11-106(a)(5)(B).

The defendant was convicted of one count of aggravated child abuse through the use of a deadly weapon for hitting the victim repeatedly with a wooden board. The second count of aggravated child abuse through the use of a deadly weapon relates to the incident during which the defendant choked the victim with a dog leash.

<u>The victim testified that while he and "Johnnie" were alone in the victim's residence, "Johnnie" placed a dog leash around his neck and repeatedly choked him causing bruises around his neck. The victim stated he felt as if "some blood was getting [sic] to ... bust out." He testified that on the same day, "Johnnie" spanked him multiple times with a black board taken from the entertainment center. The victim stated he fell on the floor each time he was hit, and he had bruises on his buttocks as a result of the spankings. Our review of the photographs clearly reveals these bruises are certainly not normal injuries one would expect to see on a child. The photographs of the buttocks depict excessive discoloration that extends all the way across both buttocks.</u>

The victim's mother and grandmother testified regarding the bruises they observed on the victim after he had been left alone with the defendant on June 16th. The victim's mother, his grandmother, the detective, and the DCS case worker stated the victim maintained that the defendant caused the injuries. The victim's mother stated the defendant confessed to the offenses and wanted her to take the blame. Dr. Greeley testified that the injuries were unlikely accidental or self-inflicted; that the injuries were consistent with the victim's explanation as to how they were caused; that the bruises on the victim's buttocks were extensive; and that the force of the choking could have caused the victim's windpipe or an artery to burst,

10

resulting in brain damage or death. Further, the wooden board and the leash, due to the manner of their use, were capable of causing serious bodily injury. See Tenn. Code Ann. § 39-11-106(a)(5)(B). In viewing the evidence in a light most favorable to the state, we conclude the proof presented at trial was sufficient to support the defendant's convictions for aggravated child abuse.

The defendant contends the victim was not subjected to a meaningful examination at trial regarding his ability to distinguish between the truth and a lie. However, the defendant failed to object on this basis at trial. By failing to make a contemporaneous objection to testimony, a defendant waives appellate consideration of the issue. State v. Alder, 71 S.W.3d 299, 302 (Tenn. Crim. App. 2001); State v. Thompson, 36 S.W.3d 102, 108 (Tenn. Crim. App. 2000). Regardless, the victim testified he knew the difference between the truth and a lie; that he would be punished for telling a lie; and that he would tell the truth while testifying. This argument is without merit.

The defendant next identifies various inconsistencies in the victim's testimony. However, these alleged inconsistencies involve the credibility of the witness, which is within the exclusive purview of the jury as the trier of fact. This argument is without merit.

The defendant argues that although Dr. Greeley was a qualified expert in the area of pediatrics, he was not qualified as an expert in the area of bruising and, therefore, testified beyond the scope of his expertise. However, the defendant failed to object on this basis at trial. Therefore, this argument is waived. See Alder, 71 S.W.3d at 302; Thompson, 36 S.W.3d at 108.

The defendant next claims that the jury's verdict was based upon speculation and inferences drawn from inferences. In support of this argument, the defendant notes his alibi defense. However, the defendant presented this alibi defense to the jury, who, as the exclusive trier of fact, rejected the defense and convicted the defendant of the charges. See Forbes v. State, 559 S.W.2d 318, 324 (Tenn. 1977). We are not at liberty to set aside this credibility determination.

Finally, the defendant contends the evidence was insufficient to establish the victim's age at the time the offenses occurred. We note that in discussing the elements of the offenses with the trial court prior to closing arguments, defense counsel conceded that the victim's age was not an issue. Regardless, the victim testified he was six years old at the time of trial and four or five years old when the offenses occurred. We conclude this evidence is sufficient to establish that the victim was six years old or less when the offenses occurred.

2003 WL 22004946 at **5-6 (emphasis added).

11

For a Fourteenth Amendment claim based upon insufficient evidence, <u>Jackson v. Virginia</u>,

443 U.S. 307 (1979) sets the standards for habeas review:

> ...[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. But this inquiry does not require a court to `ask itself whether <u>it</u> believes that the evidence at the trial established guilt beyond a reasonable doubt.' Instead, **the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.** This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidenc2e, and to draw reasonable inferences from basic facts to ultimate facts. **Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review all of the evidence is to be considered in the light most favorable to the prosecution.** The criterion thus impinges upon `jury' discretion only to the extent necessary to guarantee the fundamental protection of due process of law.

<u>Id.</u> at 318-19 (emphasis added with footnotes and citations omitted).

A presumption of correctness obtains in determining whether sufficient evidence exist to

support a conviction. 28 U.S.C. § 2254(e). If any rational finder of fact would accept the

evidence as establishing each essential element of the crime, the <u>Jackson</u> standard of review is

satisfied. 443 U.S. at 324. The rule concerning reasonable inferences applies with equal force to

historical facts. <u>Parke v. Raley</u>, 506 U.S. 20 (1992) (involving the challenge to a prior conviction

that resulted in enhancement of a sentence). Yet, reliance on legislative presumptions to prove

facts is insufficient. <u>Hicks v. Feiock</u>, 485 U.S. 624, 637-40 (1988).

Circumstantial evidence, if sufficient to establish an element of the offense, satisfies

constitutional requirements of due process, <u>Wiley v. Sowders</u>, 669 F.2d 386, 390 (6th Cir. 1982)

(per curiam), and such evidence need not remove every reasonable hypothesis except that of guilt.

12

United States v. Vannerson, 786 F.2d 221, 225 (6th Cir. 1986). Uncorroborated accomplice testimony is sufficient to support a conviction under the United States Constitution. Takacs v. Engle, 768 F.2d 122, 127 (6th Cir. 1985). This due process guarantee of sufficiency of the evidence extends only to the elements of the crime, not to the state's burden to prove the absence of an affirmative defense, unless the state has made the absence of a defense an element of the crime. Allen v. Redman, 858 F.2d 1194, 1196-98 (6th Cir. 1988). Hearsay evidence can support a state conviction, provided that the hearsay qualifies as an exception to the hearsay rule. White v. Illinois, 502 U.S. 346, 355-57, 356 n.8 (1992). The standard is whether the hearsay evidence carries sufficient guarantees of trustworthiness. Curro v. United States, 4 F.3d 436, 437 (6th Cir. 1993)

Here, the state courts' holding that Petitioner either waived any objection to the competency of the child witness by failing to make contemporaneous objection or the child's testimony of his understanding of the difference between truth and a lie is reasonable based upon the State record. Petitioner did not object to the expert testimony of Dr. Greeley at trial. As to victim's inconsistency, credibility of witnesses is for the jury. The State appellate court rejected Petitioner's challenge to the jury verdict and that the victim's age was not established. The victim's age is not an element of the offense under Tennessee law. In any event, the undisputed proof was that at the time of these offenses the victim was four or five years old. The state courts' disposition of this claim is not unreasonable nor contrary to Jackson.

### b. Ineffective Assistance of Counsel

### 1. Trial Counsel's Failure to Effectively Cross-Examine Witnesses

On this claim, Petitioner contends that his trial counsel failed to cross-examine the State's

13

witnesses about inconsistencies in their testimonies. The Tennessee Court of Criminal Appeals rejected this claim and ruled that:

> There were inconsistencies, for example, in Lydia Roberts testimony concerning when she saw Petitioner and Pamela Roberts on June 16 and June 17, 2000, and when she first noticed the victim's injuries. Our review of the trial transcript shows that counsel cross-examined Ms. Roberts at length about her conflicting statements to the Department of Children's Services, her inconsistent testimony concerning when she first noticed the victim's injuries, and her inconsistent testimony about when she had seen Petitioner and Pamela Roberts on June 16 and June 17, 2000. Based on our review, we conclude that Petitioner has failed to show that his counsel's cross-examination of this witness was deficient.

2006 WL 360380 at *10.

Petitioner's next claim is that his trial counsel's representation was deficient when he did not cross-examine Dr. Greeley, the State's expert witness. As to this claim, the Tennessee appellate court found as follows:

> Petitioner argues that counsel's performance was deficient because he did not cross-examine Dr. Greeley or object to the State's use of leading questions during Dr. Greeley's direct examination. The post-conviction court found that Petitioner had failed to demonstrate that his counsel's representation was deficient in this regard, and that, based on a review of the trial transcript, Petitioner failed to demonstrate that he had been prejudiced by any leading questions asked of Dr. Greeley during his direct examination.

> Counsel testified at the post-conviction hearing that Petitioner's defense was that he did not inflict the victim's injuries, and that challenging Dr. Greeley's description of the severity of the injuries would have been inconsistent with Petitioner's defense. Petitioner's counsel testified that Petitioner strongly believed that he had a viable alibi defense, and Petitioner, Mr. Reeves and Mr. Hall all testified that Petitioner was in Kentucky on Friday, June 16, 2000, when the victim's injuries were incurred. Regardless of whether or not counsel's strategic decision not to cross-examine Dr. Greeley was, in hindsight, perhaps not as successful as Petitioner might wish, counsel's approach to the cross-examination, or lack thereof, of the State's witnesses was reasonable in light of Petitioner's alibi evidence and counsel's strategic decision not to disclose Petitioner's alibi prior to the presentation of Petitioner's proof.

14

Id. at *11 (emphasis added).

The third aspect of this ineffective assistance of counsel claim is that counsel's alleged inadequate investigation of Petitioner's alibi defense, including telephone records, police reports, and interviews of witnesses who "knew where [Petitioner] was everyday from June 11, 2000 til June 21, 2000." (Handwritten attachment to Petition at p. 3). The Tennessee Court of Criminal Appeals rejected this claim as lacking factual support.

> Petitioner argues that counsel's assistance was ineffective when he failed to subpoena the telephone records for the pay phone at the Tennessee/Kentucky state line and the records for his mother's telephone number in Ashland City in order to corroborate his alibi. Counsel testified at the post-conviction hearing that he and Petitioner drove to the telephone booth which Petitioner used to make his telephone call on June 16, 2000, and retrieved the phone number. Counsel said that he subpoenaed the records for that telephone number, but no records were found. Counsel could not remember whether he subpoenaed the records for the Reeves' home telephone number after the family was unsuccessful in finding any records documenting the call. Petitioner, however, testified that counsel told him to try to get the records for the Ashland City telephone number, and that if he was unsuccessful, then counsel would subpoena the records. Petitioner explained, "[a]nd when we couldn't get them, they said that they wasn't [sic] going back that far, then [counsel] tried to have them subpoenaed. And [counsel] told us that they didn't have [the records]." The post-conviction court specifically credited counsel's testimony on this issue. The evidence does not preponderate against the post-conviction court's findings that counsel's inability to secure the telephone records did not reflect deficient conduct.

Id. at *13 (emphasis added).

To establish ineffective assistance of counsel, Petitioner must demonstrate that under the totality of the circumstances, his trial counsel performed deficiently and that counsel's performance resulted in prejudice. Strickland v. Washington, 466 U.S. 668, 695 (1984). As the Supreme Court has explained:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not

> functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.
> Second, the defendant must show that the deficient performance prejudiced the
> defense. This requires showing that counsel's errors were so serious as to deprive
> the defendant of a fair trial, a trial whose result is reliable.

Id. at 687. As to the "performance" inquiry, "[t]he proper measure of attorney performance

remains simply reasonableness under prevailing professional norms." Id. at 688.

   In any event, Strickland directs that "[j]udicial scrutiny of counsel's performance must be

highly deferential" and "[i]n any ineffectiveness case, a particular decision not to investigate must

be directly assessed for reasonableness in all the circumstances, applying a heavy measure of

deference to counsel's judgments." Id. at 689, 691. As the Supreme Court noted, "[c]ounsel's

actions are usually based, quite properly, on informed strategic choices made by the defendant and

on information supplied by the defendant. In particular, what investigation decisions are

reasonable depends critically on such information." Id. at 691 (emphasis added). Counsel's

failure "to conduct constitutionally adequate pretrial investigation into potential evidence" can

"hamper[] [their] ability to make strategic choices." Harries v. Bell, 417 F.3d 631, 639 (6th Cir.

2005). A court must examine not only to the individual errors of counsel, but must also view the

effect of the errors cumulatively. See Draper v. Adams, 215 F.3d 1325, 2000 WL 712376, at *3

(6th Cir. May 23, 2000).

   To establish prejudice due to his counsel's errors or omissions, Petitioner must establish a

reasonable probability that but for counsel's unprofessional errors, the result of the proceeding

would have been different. A reasonable probability is a probability sufficient to undermine

confidence in the outcome. Williams, 529 U.S. at 390-91. In a word, "[t]he result of a proceeding

can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel

16

cannot be shown by a preponderance of the evidence to have determined the outcome."
Strickland, 466 U.S. at 694.

A trial's counsel's cross-examination of witnesses is a strategic decision of counsel based upon the facts of the case and defense strategy. Under Strickland, such strategic decisions are not grounds for federal habeas relief. Petitioner's trial counsel cross-examined witnesses and the extent of the cross-examination of Dr. Greeley was consistent with the defense theory. The Tennessee Court of Criminal Appeals accurately summarized the evidence presented at the post-conviction hearing and relied on applicable law to conclude that Petitioner had failed to carry his burden of showing that his trial counsel's performance was in any way deficient or prejudicial. Plaintiff's proof of his two alibi witnesses with their internal inconsistencies and ambiguities do not support his alibi defense and their testimony would be consistent with the State's theory. Under these circumstances, the Tennessee court's rulings on these claims are neither unreasonable nor contrary to clearly established federal law, nor is Plaintiff's proof in this action sufficient to establish any prejudice.

As to Petitioner's claim about his trial counsel's inadequate investigation of telephone records for his alibi defense, under Strickland, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Id. at 691. As to the duty to investigate:

> These standards require no special amplification in order to define counsel's duty
> to investigate, the duty at issue in this case. As the Court of Appeals concluded,
> strategic choices made after thorough investigation of law and facts relevant to
> plausible options are virtually unchallengeable; and strategic choices after less
> than complete investigation are reasonable precisely to the extent that reasonable
> professional judgments support the limitation on investigation. In other words,
> counsel has a duty to make reasonable investigations or to make a reasonable

17

decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decision, just as it may be critical to a proper assessment of counsel's other litigation decisions.

Id. at 690-91.

Here, Petitioner's counsel traveled with Petitioner to track down the telephone from which Petitioner allegedly made a telephone call, but the telephone was not located where Petitioner stated. Thus, Petitioner's counsel made a reasonable inquiry and the Tennessee appellate court's finding of a lack of prejudice caused by trial counsel is not unreasonable. Petitioner's counsel did conduct an investigation on this issue. Accordingly, this Court concludes that the state courts' adjudication of this claim is not unreasonable under the facts nor contrary to applicable law.

### 3. Petitioner's Defaulted Claims

As to Petitioner's unexhausted claims, on his post-conviction appeal, Petitioner's claims were:

Petitioner appeals the dismissal of his petition for post-conviction relief in which he contended (1) that trial counsel failed to cross-examine the six-year-old victim as to his competency as a witness prior to the victim's testimony at trial; (2) that

18

trial counsel failed to effectively cross-examine witnesses and make timely objections; (3) that trial counsel failed to effectively investigate the case and subpoena necessary documents and witnesses; and (4) that the trial court failed to instruct the jury on all lesser-included offenses. After a thorough review of the record, we conclude that Petitioner has failed to show that his trial counsel's representation was deficient or that he was prejudiced by his trial counsel's performance. We accordingly affirm the judgment of the post-conviction court.

2006 WL 360380 at *1.

The Respondent challenges the following claims in Petitioner's amended petition, filed on October 4, 2009 (Docket Entry No. 26), as unexhausted: (1) that the trial counsel failed to explain that concept of a best-interest guilty plea, id. at ¶ 25.8; (2) failed to investigate and present alibi evidence that Petitioner was in Bowling Green, Kentucky when the victim was injured, id. at ¶ 26.1 through 26.7; (3) failed to investigate and/or present evidence that someone else injured the victim, id. at ¶ 27.1 through 27.3; (4) failed to challenge the victim's competency as a witness, id, at ¶ 28.1 through 28.3; (5) failed to cross-examine effectively witnesses Roberts, Fadigan and Dr. Greeley or elicit relevant testimony for witness Pigman, id. ¶ 29.1 through 29.2; (6) the State withheld material, exculpatory evidence, id. at 31.1 through 31.4; (7) the trial court admission of a photograph suggesting the victim was sexually abused violated Petitioner's due process rights, id. at 32.1 through 32.5; (8) the trial court failure to instruct the jury on lesser-included offenses, id. at 33; (9) the trial court erred in holding a sentencing hearing without a jury, and in applying four statutory enhancement, id. at ¶ 35; and (10) that these cumulative errors warrant habeas relief. Id. at ¶ 36.

Petitioner's claims in his original petition in this action were: (1) a Brady violation based on the State's failure to properly transmit pictures with a police report; (2) ineffective assistance of counsel for his trial counsel's failures to call his mother as a witness, to cross examine Dr.

19

Greeley effectively, to not re-examine an alibi witness, to not ask questions that Petitioner prepared about Roberts's criminal background and prior child abuse, to investigate adequately his alibi defense, and to not re-cross an alibi witness; and (3) the state trial court's failure to instruct the jury on lesser offenses.  (Docket Entry No. 1 and Attachment thereto).

Petitioner's claims in his amended petition are different from his original claims. Specifically, Petitioner's new Brady claims are based upon factual allegations about witnesses. Another new claim is a due process challenge to the introduction of photographic evidence. Petitioner's sentencing and cumulative error claims were never presented to the state courts. Respondent also contends that  Petitioner's claims on the trial court's failure of the jury to instruct as to lesser included offenses, his sentencing and cumulative error claims do not state grounds for habeas relief, citing inter alia,  Schririo v. Summerlin, 542 U.S. 348, 353 (2004) and  Moore v. Parker, 425 F.3d 250, 256 (6th Cir. 2005).

The pendency of a federal habeas action does not toll the limitations period for the filing of a federal habeas claim.  Duncan v. Walker, 533 U.S. 167, 181-82 (2001).  As to whether the new claims relate back to Petitioner's original claims under Mayle v. Felix, 544 U.S. 644, 664 (2005), the Court concludes that these new claims are distinct and are also based on facts not in the original petition and are based upon th eories that were not presented to the state courts. These claims that were in the amended petition filed on October 4, 2007 are also time-barred under the applicable one-year statute of limitations for federal habeas claims.

Moreover, Petitioner must exhaust all claims in state court before asserting those claims in a federal habeas action.  Wilwording v. Swenson, 404 U.S. 249, 250 (1971).  A habeas petitioner must present claims to the state courts as federal constitutional issues rather than state law issues.

20

<u>Picard v. Connor</u>, 404 U.S. 270, 275 (1971). The facts and federal legal theory raised in a petition for the federal writ of habeas corpus must have been "fairly presented" to the state courts. <u>Duncan v. Henry</u>, 513 U.S. 364, 365-66 (1995) (<u>per curiam</u>) (citing <u>Picard</u> and <u>Anderson v. Harless</u>, 459 U.S. 4, 6 (1982) (<u>per curiam</u>) ("It is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made." "[A] federal habeas petitioner ... [must] provide the state courts with a 'fair opportunity' to apply controlling legal principles to the facts bearing upon his constitutional claim.")). A claim supported only by citation to state law is insufficient to present a federal claim, even if the cited state decision restated an analysis of federal law. <u>Harless</u>, 459 U.S. at 7-8 n.3. The state courts must be provided with a "fair opportunity" to apply controlling legal principles to the facts bearing upon the petitioner's constitutional claim. <u>Id.</u> at 6.

"[T]he doctrine of exhaustion requires that a claim be presented to the state courts under the same theory in which it is later presented in federal court." <u>Wong v. Money</u>, 142 F.3d 313, 322 (6th Cir. 1998). As a matter of federal law, to avoid procedural default, federal law requires a federal habeas petitioner in Tennessee to present his federal claims to the Tennessee Court of Criminal Appeals. <u>Covington v Mills</u>, 110 Fed. Appx. 663, 666 (6th Cir. 2004).

The "Procedural Default Doctrine" bars consideration of a federal claim in a habeas action that was not presented to the state court or was decided on state law grounds.

> [t]his Court will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment. <u>This rule applies whether the state law ground is substantive or procedural.</u> In the context of direct review of a state court judgment, the independent and adequate state ground doctrine is jurisdictional. <u>Because this Court has no power to review a state law determination that is sufficient to support the judgment, resolution of any</u>

21

> independent federal ground for the decision could not affect the judgment and
> would, therefore, be advisory. . .
>
> ***
>
> . . . the doctrine applies also to bar federal habeas when a state court declined to
> address a prisoner's federal claims because the prisoner had failed to meet a state
> procedural requirement. In these cases, the state judgment rests on an independent
> and adequate state procedural ground.

Coleman v. Thompson, 501 U.S. 722, 729-30 (1992) (emphasis added and citations omitted).

Yet a presumption of no procedural default arises if the state court decision "fairly appears

to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy

and independence of [the] state law ground is not clear from the face of the opinion." Id. at 735.

Further, this doctrine applies only to "firmly established" and regularly followed state procedural

rules. Ford v. Georgia, 498 U.S. 411, 423-24 (1991). Here, Respondent cites Tenn. Code Ann. §

40-30-102 (a) and (c) that has a one year limitation period that has long since passed for

presenting any of this claim and State precedent on appellate waiver.

The standard analysis for procedural default was set forth by the Sixth Circuit in the oft-

cited Maupin v. Smith, 785 F.2d 135, 138 (6th Cir. 1986):

> When a state argues that a habeas claim is precluded by the petitioner's failure to
> observe a state procedural rule, the federal court must go through a complicated
> analysis. First, the court must determine that there is a state procedural rule that is
> applicable to the petitioner's claim and that the petitioner failed to comply with the
> rule.
>
> ***
>
> Second, the court must decide whether the state courts actually enforced the state
> procedural sanction.
>
> ***

22

Third, the court must decide whether the state procedural forfeiture is an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim.... This question generally will involve an examination of the legitimate state interests behind the procedural rule in light of the federal interest in considering federal claims.

Maupin, 785 F.2d at 138 (citations omitted).

### Noncompliance with Applicable State Rules

Any reliance on a state rule must be express, *i.e.*, supported by citation to a state law or court rule as well as a showing of how the facts of the case violate that rule. Walker v. Engle, 703 F.2d 959, 966 (6th Cir. 1983). Here, the Tennessee Appellate Court cited its precedent that claim that should have been presented on direct appeal are deemed waived for post-conviction proceedings. Thurmond, 2006 WL 680924 at *7. Respondent also relies upon Tennessee's statute of limitations to bar these defaulted claims. Tenn. Code Ann. § 40-30-102(a) and (c). As to Petitioner's new claims in this action, if there is no state court determination of whether a petitioner's claims are procedurally defaulted under state law, then the Court is to consider whether the state court would bar the claims if presented to them. Engle v. Isaac, 456 U.S. 107, 125-26 n.28 (1982). As discussed infra, the Court concludes that the Tennessee courts would conclude that these claims are time barred.

### "Firmly Established" and "Regularly Followed" State Rules

To qualify for the procedural default rule, the cited state law also must be a firmly established and regularly followed state practice. Ford, 498 U.S. at 423-24. In Hutchison v. Bell, 303 F.3d 720 (6th Cir. 2002), the Sixth Circuit analyzed Tennessee's statute of limitations statute on post-conviction petitions and its Burford exception in a procedural default analysis:

Hutchison argues that Tennessee courts' willingness to excuse procedural default

23

pursuant to <u>Burford</u> demonstrates that state procedural rules are not regularly followed in the context of later-arising claims.

Nevertheless, we agree that Tennessee's due process exception does not render this provision inadequate. Tennessee's due process exception does not grant unfettered discretion to state courts in applying procedural default rules. Although Tennessee courts will often permit the hearing of an untimely claim, the decision is confined by the due process standards delineated in <u>Burford</u> and its progeny. The Tennessee courts consistently enforce a procedural scheme that encompasses both the one-year limitations period and a court-recognized procedure for tolling that statute when specific due process grounds are presented....

In <u>Hannah v. Conley</u>, 49 F.3d 1193 (6th Cir. 1995) (per curiam), this Court found that the then-applicable three-year statute of limitations for post-conviction petitions in Tennessee was regularly applied and would bar presentation of an unexhausted claim. <u>Id.</u> at 1197. The <u>Hannah</u> court noted that the language of the statute was mandatory in that it provided that a claimant "must" petition within three years or his claim "shall" be barred. <u>Id.</u> at 1196. The current one-year statute of limitations contains the same mandatory language. <u>See</u> T.C.A. § 40-30-202(a).

Although the previous cases did not present a <u>Burford</u> type later arising claim, we do not find that the state's <u>Burford</u> tolling rules command a different result. . . .

Given that tolling under <u>Burford</u> is not discretionary and given this Circuit's reluctance to discourage state courts from exhibiting caution before applying procedural default rules in capital cases, we conclude that the <u>Burford</u> exception does not render Tennessee's procedural rules inadequate.

<u>Id.</u> at 738-739. (footnotes omitted).

The Sixth Circuit also ruled in <u>Hutchinson</u> that despite the <u>Burford</u> exception to the Tennessee timeliness rule, <u>Burford</u> was not a separate constitutional claim. <u>Id.</u> at 740-41. In a word, <u>Hutchinson</u> found the Tennessee limitations rule to constitute a firmly established and regularly followed state law. Thus, the Court concludes that Tennessee's limitations statute is an independent and regularly enforced state rule.

### Adequacy of the State Rule

The Supreme Court recognized the following state interests as constituting adequate

24

grounds for state procedural rules.

> The possible avoidance of an unnecessary trial or of a retrial, the difficulties of
> making factual determinations concerning grand juries long after the indictment
> has been handed down and the grand jury disbanded, and the potential disruption to
> the numerous convictions of finding a defect in a grand jury only after the jury has
> handed down indictments in many cases.

Coleman, 501 U.S. at 745-46.

Another reason to support a finding of adequate state rules was decided in Frances v.

Henderson, 425 U.S. 536 (1976), where the Supreme Court enforced a state rule that promoted

finality, noting a comparable federal rule.

> Plainly the interest in finality is the same with regard to both federal and state
> prisoners. ... There is no reason to ... give greater preclusive effects to procedural
> default by federal defendants than to similar defaults by state defendants. To hold
> otherwise would reflect an anomalous and erroneous view of federal-state
> relations.

425 U.S. at 541-42.

Procedural rules such as statutes of limitations have been found to be independent and

adequate. In Coleman, the Supreme Court upheld a procedural rule that bars consideration of a

federal claim for failure to meet state law requirements for timely appeals. 501 U.S. at 750-51. In

Brown v. Allen, 344 U.S. 443, 485-86 (1953), the Court also applied the procedural default rule to

a state rule that placed time limits on appellate rights. Accord Reed v. Farley, 512 U.S. 1277

(1994) (denying writ due to waiver of delay under the Interstate Agreement on Detainers by

failure to object at trial and to establish prejudice). Moreover, State rules that failure to object at

trial to preserve a claim is also an adequate State rule. Wainwright v. Sykes, 433 U.S. 72, 86-87,

91 (1977).

The Court concludes that Tennessee's statutes of limitations are adequate for procedural

default purposes and are regularly enforced.

## Cause and Prejudice

Given these procedural defaults, Petitioner must establish cause and prejudice to excuse such non-compliance. The "cause" for the default must be external to the petitioner and must otherwise be attributable to the state.

> . . . we think that the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule. Without attempting an exhaustive catalog of such objective impediments to compliance with a procedural rule, we note that a showing that the factual or legal basis for a claim was not reasonably available to counsel, see Reed v. Ross, 468 U.S., at 16, or that `some interference by officials,' Brown v. Allen, 344 U.S. 443, 486 (1953), made compliance impracticable, would constitute cause under this standard.

Carrier, 477 U.S. at 488 (emphasis added).

An often cited factor to establish cause for a procedural default is the petitioner's state counsel's failure to raise an issue or to comply with a state law to present a given habeas claim. Inadequate counsel can prove cause, but only if counsel's conduct violates Sixth Amendment standards and counsel's inadequate conduct has been presented to the state courts. The Supreme Court emphasized in Coleman that mere attorney error cannot be cause and cannot be attributable to the state.

> Attorney ignorance or inadvertence is not `cause' because the attorney is the petitioner's agent when acting, or failing to act, in furtherance of the litigation, and the petitioner must `bear the risk of attorney error.' ... Attorney error that constitutes ineffective assistance of counsel is cause, however ... as Carrier explains, `if the procedural default is the result of ineffective assistance of counsel, the Sixth Amendment itself requires that responsibility for the default be imputed to the state.' [quoting Carrier, 477 U.S. at 488]. In other words, it is not the gravity of the attorney's error that matters, but that it constitutes a violation of petitioner's right to counsel, so that the error must be seen as an external factor, i.e., `imputed

26

to the state.'

Coleman, 501 U.S. at 753-54 (emphasis added).

As noted earlier, the standard for cause attributable to counsel is the constitutional standard under the Sixth Amendment for attorney performance, i.e., whether counsel provided "reasonably effective assistance," Carrier, 466 U.S. at 687, and counsel's performance must be both inadequate and prejudicial to the defense.

For the reasons stated on Petitioner's ineffective assistance of counsel claims, the Court concludes that Petitioner has not demonstrated cause for his trial counsel's failures to present these defaulted claims to the State courts. This same rationale leads the Court to conclude that Petitioner has not established prejudice for these defaults. To the extent, state post-conviction counsel's omissions caused claims not to be presented, such omissions cannot establish cause. Coleman, 501 U.S. at 756-57.

To be sure, the procedural default doctrine may not preclude federal habeas review if failure to hear the petitioner's defaulted claim would result in a fundamental miscarriage of justice or would prove his actual innocence of the offense. Sawyer v. Whitley, 505 U.S. 333, 339 (1992). If there were an error-free trial and the actual innocence claim was based upon newly discovered evidence, then the petitioner's showing of actual innocence must be "truly persuasive" or "extraordinarily high" to show a "constitutionally intolerable event" as well as the lack of an available state remedy. Herrera v. Collins, 506 U.S. 390, 427 (1993).

For this miscarriage of justice exception to procedural default, Petitioner asserts Brady claims that prior to his trial, the State withheld a Polaroid photograph of the victim's buttocks, taken at the time of the State's investigation, showing that the victim without injuries and

27

documents that one or more of the victim's family members was perpetrator(s) of the abuse. This Polaroid photograph of the victim was not presented at the evidentiary hearing in this action. The State introduced another photograph purportedly taken earlier and showing injuries to the victim. Petitioner did not offer proof of that photograph. From the Court's review of the record, Petitioner did not file nor request the trial record nor did he file exhibits in response to Respondent's motion for judgment as a matter of law. Petitioner submitted other proof in opposition. As to Petitioner's alibi defense, at Petitioner's trial, Pamela Roberts, the victim's mother, testified that she also struck the victim on the day at issue and detective Fadigan so testified. The Court concludes that Petitioner's Brady claims lack any factual support.

As to his alibi witnesses at the evidentiary hearing in this action to establish his actual innocence, such claims must be substantive or factual, not procedural, e.g., a claim of innocence based on ineffective assistance of counsel or a prosecutor's failure to disclose Brady material is procedural and subject to the procedural default doctrine. Schulp v. Delo, 513 U.S. 298 (1995). As the Court in Schulp explained, "if there were no question about the fairness of the criminal trial, a Herrera type claim would have to fail unless the federal habeas court is convinced that those new facts unquestionably establish [the petitioner's] innocence. On the other hand, if the habeas court were merely convinced that those new facts raise sufficient doubt about [the petitioner's] guilt to undermine confidence in the result of the trial without the assurance that the trial was untainted by constitutional error [the petitioner's] threshold showing of innocence would justify a review of the merits of the constitutional claims." Id. at 317. Where the claim of actual innocence is premised upon a trial with error, then a different and lesser standard of judicial review of "sufficient doubt" applies.

28

In Schlup, the Court addressed the standard of proof that a federal petitioner would have to show to establish the actual innocence exception to the procedural default rule in non-capital cases. In contrast, for cases other than death penalty cases, the Court in Schlup applied the standard in its earlier Carrier decision stating,

> [W]e hold that the Carrier "probably resulted" standard rather than the more stringent Sawyer standard must govern the miscarriage of justice inquiry when a petitioner who has been sentenced to death raises a claim of actual innocence to avoid a procedural bar to the consideration of the merits of his constitutional claims.
>
> The Carrier standard requires the habeas petitioner to show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." 477 U.S. at 496, 106 S.Ct. at 2649-2650. To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence. The petitioner thus is required to make a stronger showing than that needed to establish prejudice. At the same time, the showing of "more likely than not" imposes a lower burden of proof than the "clear and convincing" standard required under Sawyer. The Carrier standard thus ensures that petitioner's case is truly "extraordinary," McCleskey, 499 U.S. at 494, 111 S.Ct. at 1470, while still providing petitioner a meaningful avenue by which to avoid a manifest injustice.
>
> Carrier requires a petitioner to show that he is "actually innocent." As used in Carrier, actual innocence is closely related to the definition set forth by this Court in Sawyer. To satisfy the Carrier gateway standard, a petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.
>
> Several observations about this standard are in order. The Carrier standard is intended to focus the inquiry on actual innocence. In assessing the adequacy of petitioner's showing, therefore, the district court is not bound by the rules of admissibility that would govern at trial. Instead, the emphasis on "actual innocence" allows the reviewing tribunal also to consider the probative force of relevant evidence that was either excluded or unavailable at trial. Indeed, with respect to this aspect of the Carrier standard, we believe that Judge Friendly's description of the inquiry is appropriate: the habeas court must make its determination concerning the petitioner's innocence "in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or

29

to have become available only after the trial."

The consideration in federal habeas proceedings of a broader array of evidence does not modify the essential meaning of "innocence." The <u>Carrier</u> standard reflects the proposition, firmly established in our legal system, that the line between innocence and guilt is drawn with reference to a reasonable doubt. <u>See In re Winship</u>, 397 U.S. 358, 90 S.Ct. 1068. Indeed, even in <u>Sawyer</u>, with its emphasis on eligibility for the death penalty, the Court did not stray from the understanding that the eligibility determination must be made with reference to reasonable doubt. Thus, whether a court is assessing eligibility for the death penalty under <u>Sawyer</u>, or is deciding whether a petitioner has made the requisite showing of innocence under <u>Carrier</u>, the analysis must incorporate the understanding that proof beyond a reasonable doubt marks the legal boundary between guilt and innocence.

<u>Id.</u> at 326-28.

Here, for the same reasons stated on the Petitioner's sufficiency of the evidence claim and considering the Petitioner's proof at the evidentiary hearing in this action, the Court concludes that Petitioner has not met the standard under the actual innocence doctrine to excuse his procedural defaults or to demonstrate his actual innocence.

For these reasons, the petition for writ of habeas corpus should be denied.

An appropriate Order is filed herewith.

**ENTERED** this the ⟋8⁺ day of February, 2010.

WILLIAM J. HAYNES, JR.
United States District Judge

30